**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Highlake Maritime Limited,

*Plaintiff*,

v.

Kai Christian Poetschke and Intelligent
Capital Management, LLC,

*Defendants*.

Case No.

Hon.

## COMPLAINT

Plaintiff Highlake Maritime Limited ("Highlake" or "Plaintiff"), by and through its attorneys, McDermott Will & Emery LLP, hereby alleges as follows:

## INTRODUCTION

1.      Highlake is a company that was established in 1999 as an estate planning and succession tool for a group of Venezuelan siblings.  Highlake's sole purpose is, and always has been, to provide a financial safety net for this family.

2.      Esteban Pineda, Jr. ("Esteban"), one of the siblings of this family, currently serves as Highlake's point of contact with one of Highlake's longtime investment advisors.  Esteban inherited this role after his father, Esteban Pineda, Sr. ("Esteban Sr."), passed away on June 11, 2010.  Since taking on this role, Esteban's goal has been the same goal that Esteban Sr. set when Highlake was first established in 1999 – conservative maintenance, and, when possible, growth of the value of the assets held by the company so that portions of those assets can intermittently be sold and the proceeds from those sales distributed to the family's siblings as a supplement to their savings.  Indeed, Esteban, like his father before him, was consistent in his desire to avoid investing

in volatile industries and risky financial products to ensure the conservative protection of Highlake's assets.

3.     The Defendants, Kai Christian Poetschke ("Poetschke") and Intelligent Capital Management, LLC ("ICM") (collectively, the "Defendants"), are, respectively, an investment advisor and an investment advisory firm.   Both Defendants managed Highlake's assets as fiduciaries, and, in doing so, were obligated to serve the best interests of Highlake and not subordinate Highlake's interests to their own.

4.     As explained in greater detail below, the Defendants, among other unlawful conduct, violated the Securities Exchange Act of 1934 and breached their fiduciary duties to Highlake by:

  a. <u>Misrepresenting and overstating the status of Highlake's portfolio.</u>  For *years*, ICM and Poetschke provided Highlake, through Esteban, with "summaries" drafted by Poetschke that intentionally and grossly exaggerated the then net value of Highlake's portfolio.

  b. <u>Failing to disclose, and affirmatively concealing, negative information about the status of Highlake's portfolio.</u>  Similar to the above, ICM and Poetschke for *years* knowingly and intentionally failed to provide Highlake with accurate account statements showing the then net value of Highlake's portfolio.  In doing so, the Defendants knowingly and intentionally failed to disclose, and in fact affirmatively concealed, massive losses they caused Highlake through their own mismanagement.

  c. <u>Engaging in an undisclosed, risky investment strategy that was contrary to the consistently established goal of Highlake.</u>  ICM and Poetschke for *years* maintained

2

an extremely aggressive, fraught-with-risk investment strategy that was inconsistent with Esteban's (and before him, his father's) desire for conservatism. To this point, the Defendants, unbeknownst to Highlake, engaged in extensive and substantial margin trading that involved risky financial products, exposing Highlake to unreasonable losses that ultimately decimated the actual value of Highlake's portfolio.  The Defendants never disclosed, and in fact affirmatively concealed, this unnecessarily risky trading.

d. <u>Artificially inflating Highlake's assets under management to generate additional and unreasonable management fees</u>.  For *years*, ICM and Poetschke took out loans on Highlake's behalf, which had the effect of artificially inflating the gross assets held by Highlake and, in turn, generating higher management fees for the Defendants.  Perversely, this leveraging strategy worked for the Defendants by maximizing their management fees, but at the cost of Highlake *by dissipating the net value of its portfolio by what is believed to be over 73%.*

5.      Despite the fact that ICM and Poetschke not only owed, but also promised, independence, transparency, and performance in connection with their management of Highlake's portfolio, they did not provide such.  Indeed, for *years* ICM and Poetschke misled and concealed information from Highlake.  For *years*, ICM and Poetschke fraudulently lined their own pockets at Highlake's expense.

6.      Due to the Defendants' fraud and concealment, it is believed that the value of Highlake's portfolio has decreased *by over 73%* since just December 2016.  Translated into dollars, in less than four years, the Defendants' conduct has cost Highlake over an estimated $7 million in account losses, $750,000 in management fees, and $900,000 in loan interest, totaling damages in

excess of $8.5 million.[1]  And this amazingly all occurred during one of the longest bull runs in the history of the United States economy.

7.      To be clear, this lawsuit is not the result of a disgruntled investor upset, after-the-fact, with sizable but legitimate losses, *i.e.*, an investor with some form of buyer's remorse.  That scenario is inapplicable here as it would involve at least some level of control and transparency.  Instead, this lawsuit stems from the Defendants' repeated, self-interested trading pattern and the intentional efforts they engaged in along the way to conceal that irresponsible and unreasonable trading from Highlake.

## THE PARTIES

8.      Plaintiff Highlake Maritime Limited is an International Business Company incorporated on February 5, 1999 in the British Virgin Islands with its registered office in Tortola, British Virgin Islands.  Esteban is Highlake's point of contact with whom the Defendants consistently interacted, misled, and defrauded.

9.      Defendant Kai Christian Poetschke is an individual who has maintained residences in both Miami Beach, Florida and Zurich, Switzerland throughout the relevant timeframe.  On information and belief, Poetschke has actively maintained a residence in the greater-Miami metropolitan area since at least April 2003 and has maintained a Florida driver's license since at least 2010.  Poetschke is a co-founder and managing member of, and investment advisor associated with, ICM.  Poetschke was, at all relevant times, an active participant in the management of Highlake's investment account and Highlake's investment advisor.  At all relevant times, Poetschke worked for, and on behalf of, ICM with respect to Highlake.  Throughout the timeframe

---

[1] These and similar loss figures repeatedly referenced in this Complaint are estimated losses based upon limited information currently available to Plaintiff.  Plaintiff anticipates the loss figures ultimately proven at a trial in this matter will be significantly greater than those pleaded here.

relevant to the allegations herein, Poetschke communicated with Highlake via an ICM email address.

10.     Defendant Intelligent Capital Management, LLC is a Florida limited liability company that was first organized in the State of Florida in 2008; its principal place of business is in Miami, Florida.  Since at least May 2011, ICM's registered address has been the same as Poetschke's personal residence address in Miami Beach, Florida.  ICM is an investment advisory firm and has, in the past, been registered as an investment advisor with the Securities and Exchange Commission ("SEC").

11.     Poetschke is also a registered representative of Key Capital Advisors, Inc. ("KCA"), a private wealth management company headquartered in Miami, Florida that is registered with the SEC as an investment advisor.  KCA uses the same physical address in the Brickell neighborhood of Miami that ICM used until May 2011.  According to KCA's website, Poetschke "has worked in close proximity with KCA for ten years," *i.e.*, during the time period in which the Defendants defrauded Highlake.

## JURISDICTION AND VENUE

12.     The Court has original jurisdiction over the Securities Exchange Act claim asserted herein, pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

13.     The Court has supplemental jurisdiction over the remaining claims asserted herein, pursuant to 28 U.S.C. § 1367(a).

14.     The Court has personal jurisdiction over Poetschke because the conduct alleged herein involving Poetschke occurred in this district, Poetschke transacts business in this district, and Poetschke maintains a residence in this district.

15.     The court has personal jurisdiction over ICM because ICM is registered to do business in Florida with a registered address in this district, the conduct alleged herein involving ICM occurred in this district, and ICM transacts business in this district.

16.     Venue is proper in this district (1) pursuant to 15 U.S.C. § 78aa because the violations of the Securities Exchange Act alleged herein occurred in this district, (2) because the Defendants transact business in this district, and (3) because ICM's principal place of business is in this district.  Venue is further proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Highlake's claims occurred in this district.

## FACTUAL BACKGROUND

I.     *Reasonable, Customary, and Accepted Investment Advisor Practices*

17.     An investment advisor is trusted with his or her client's most important assets: investment accounts, nest eggs, retirement funds, etc.  Because of the great responsibility associated with this trust, investment advisors are held to a duty of utmost good faith, and full and fair disclosure of all material facts, as well as an obligation to employ reasonable care to avoid misleading clients.

18.     An investment advisor works with clients to determine the best investments for each client's unique circumstances.  An investment advisor can only fulfill this obligation by having a complete understanding of the client's financial situation and engaging in frank, open, and transparent conversations with the client about the client's financial situation, level of financial sophistication, investment experience, risk tolerance, and financial goals.

19.     An investment advisor is obligated to abide by a client's risk tolerance and execute a strategy aimed at achieving a client's stated investment goals, even if the investment advisor would financially benefit from a more aggressive strategy than that desired by the client.  An

investment advisor must adopt the client's goals, objectives, and ends, and must always serve the best interests of the client and not subordinate the client's interests to those of the advisor.

20.     Investment advisors must recommend investment strategies based on the client's goals, and not the goals of the investment advisor.  Further, an investment advisor must advise the client on the risks associated with each and every type of investment in which the investment advisor intends to engage, the client's expected rate of return, and the worst-case scenarios associated with each strategy.

21.     An investment advisor is obligated to explain investment strategies to its clients, such as trading on margin, investing in derivative and structured products, and other types of alternative and illiquid investments.

22.     Investment advisors are held to a fiduciary standard, which means they are legally required to put their clients' best interests first.  Investment advisors must take the client's goals as direction and use their knowledge of the markets to make the best recommendations for the client.  Investment advisors that are not as transparent as they should be are often making investments that benefit their pockets more than those of the client.

23.     An investment advisor must clearly disclose how he or she is compensated in relation to a client's account, be it through a percentage of assets under management, commissions, or fees and rates.  An investment advisor must also disclose any other potential conflicts of interest associated with their management of the account.

24.     In general, the duties and responsibilities required by an investment advisor should result in offering each client a clear and understandable description of his or her strategy, keeping in mind that the advisor's clients are not always versed in investment and market strategy like the advisor—that is why the client typically engages the advisor in the first place.

25.     In connection with Highlake, the Defendants have fallen woefully short of meeting the above investment advisor standards.  Indeed, they lured in and kept Highlake as a client by falsely promising independence, transparency, and performance.

26.     And even today, through KCA, Poetschke continues to falsely (and expressly) promise to uphold these same three ideals.  Indeed, according to KCA's website, the company's three core professional objectives are:

    a.  Transparency: "Monthly, quarterly and annually we present your portfolio performance net of all fees associated with each client's account.  Our clients will always know exactly what it costs to arrive at the final net performance.  Clients have direct access to us, just as they have direct access to their portfolio at the custodian of their choice.  Total transparency permits each client to monitor their costs associated with Key Capital Advisors as well as those associated with the custodian.  We receive our fees directly from our clients only after having reviewed the portfolio performance and only after having received a written and signed authorization from the client which allows the clients' custodian to pay our fees."

    b.  Performance: "Eighteen years of historical performance."

    c.  Independence: "Key Capital Advisors is employed by you, our client.  Your goals are our goals and our loyalty is directly to you."[2]

(Exhibit 1: K. Poetschke and R. Poetschke's business cards).

27.     In reality, the Defendants have not only repeatedly failed to meet any of these three objectives with respect to Highlake, but they also have perpetuated a continuous fraud that resulted in millions of dollars in damages to Highlake.

---

[2] *See* https://www.keycapitaladvisors.com/.

II.     *Background of the Relationship between Highlake and the Defendants*

28.     Poetschke's relationship with Esteban's family dates back to before 2008, when Poetschke was advising Highlake through his then-employment with Credit Suisse's Miami office. ICM's relationship with Esteban and his family began shortly after ICM's formation in Florida.

29.     Poetschke's long relationship with the Pineda family lulled Esteban and his siblings into treating Poetschke as one of their own, just as Esteban Sr. had done.  Poetschke and ICM ultimately used this relationship of trust to their advantage and to the detriment of Highlake.

30.     Upon receiving authorization to manage Highlake, Poetschke promised that he, on behalf of ICM, would make recommendations and enter orders in the Highlake account that were consistent with the investment goals and objectives directed by Esteban Sr. and, later, Esteban.

31.     At all times, Credit Suisse has served as the custodian of the assets in the Highlake account, although others may be deemed to be custodians pursuant to federal law and administrative guidance.

32.     At all times relevant to this Complaint, Poetschke held himself out as an investment advisor affiliated with ICM.  On information and belief, Poetschke is involved with a number of money management entities, but his email communications with Esteban have *all* been via his ICM email account.

33.     At all times relevant to this Complaint, the Defendants shared discretionary authority over the Highlake account and often times exercised that authority in a fraudulent manner.

34.     On June 26, 2008, ICM, through Poetschke, sent Esteban Sr. a letter acknowledging its continued role as Highlake's investment advisor.  In this correspondence, ICM stated that it would "be responsible for the day-to-day management of your [Highlake's] investments, and also for all issues regarding your accounts at Credit Suisse."  ICM, through Poetschke, further stated:

> My [Poetschke's] role will be strictly limited to acting as your independent investment advisor.  This means that I will continue to manage your investments within the exact risk profile we have established for many years.  I will not have the ability to withdraw funds from your account without your written approval.

(Exhibit 2: 2008 letter from K. Poetschke to Esteban Pineda Sr.).

35.     Highlake, through both Esteban Sr. and Esteban, consistently expressed to Poetschke that it wanted its assets invested in safe, secure financial products.  Esteban himself consistently made clear to Poetschke that maximizing capital returns was not a fundamental concern, and that he only wanted Highlake invested in securities in which the principal would be protected.

36.     Esteban Sr. and, later, Esteban chose and communicated these investment objectives because Highlake was established as a nest egg fund for Esteban and his siblings.  Due to the designs behind Highlake's creation, the goal of the fund was an asset allocation consisting of a conservative mix of investments, such as blue chip stocks, bonds, and cash equivalents, to ensure that invested capital was preserved.  For example, as of June 12, 2012, approximately 74% of Highlake's Credit Suisse portfolio comprised cash and cash equivalents, stocks, and bonds.  Yet, as of December 31, 2016, and after the Defendants unilaterally (and without notice to Highlake) implemented their unnecessarily risky investment strategy, approximately 73% of Highlake's Credit Suisse portfolio (on a gross basis) comprised risky, structured equity investments and products.

37.     Poetschke spends significant time in Miami, and in fact, on information and belief, has consistently owned real estate in Miami since at least 2003.

38.     Esteban met with Poetschke in person in Miami on numerous occasions to review and discuss the status of the Highlake account.  In fact, all of Esteban's and Poetschke's meetings and in-person interactions took place in Miami.

39.     Esteban placed total trust and confidence in the Defendants with respect to the Highlake account.  The Defendants knew and understood that Esteban Sr. and Esteban (later) had placed their trust and confidence in the Defendants to manage the Highlake assets.

40.     In fact, after the Defendants' misconduct was finally exposed, Poetschke sent an apologetic email to Esteban from his ICM email address on April 6, 2020, stating, "[g]iven the trust you, your mother, your brothers and sisters have placed in me because of the way your father felt for me, it is devastating.  I have no words." (Exhibit 3: April 6, 2020 Email from K. Poetschke to E. Pineda).[3]

### III.     *The Defendants' Fraudulent Practices*

41.     Since at least in and around 2016, the Defendants' conduct has detrimentally impacted Highlake's portfolio.  Esteban and Highlake fully trusted the Defendants, and the Defendants took advantage of and abused that trust, despite their absolute fiduciary duty to act only in the best interest of Highlake.

42.     Through various face-to-face meetings in Miami and other communications between Esteban and Poetschke during this time period, the Defendants (1) affirmatively misrepresented the Highlake account as performing well when, in reality, the account was bleeding funds and losing value; and (2) failed to disclose the diminishing value of the account, as well as the actual securities' positions in the account.  Moreover, the Defendants (3) executed an extremely risky, aggressive investment strategy, despite knowing the mission of the Highlake portfolio was conservative growth, as consistently expressed by both Esteban and Esteban, Sr.; (4) took out significant margin loans for additional capital but then failed to immediately invest that capital and overdrew the account without disclosing the same to Highlake; and (5) artificially inflated the

---

[3] We have redacted attorney-client privileged communications from all email exhibits.  The communications between Poetschke and Esteban are unaltered and complete.

account's assets under management via loans to increase the management fees paid to the Defendants.

### A.   *Misrepresentations*

43.     The Defendants were obligated to provide Highlake, through Esteban, consistent, fulsome, and transparent updates and disclosures with respect to the performance of the Highlake account.  For years, they failed to do so.

44.     During Esteban's meetings with Poetschke in Miami, Poetschke provided Esteban with Highlake updates that were neither accurate nor complete, and in fact were often blatant lies.

45.     For example, on February 21, 2017, Poetschke sent Esteban an email from his ICM email address, providing an account "summary" update that misrepresented the value of Highlake's assets by stating the assets were worth $2,027,806 more than they actually were. (Exhibit 4: February 21, 2017 Email from K. Poetschke to E. Pineda; Exhibit 5: February 20, 2017 summary of Highlake's performance prepared by K. Poetschke).

46.     As another example, on March 22, 2019, Esteban and Poetschke met for breakfast in Miami to discuss the Highlake account's performance.

47.     During this meeting, Poetschke provided Esteban with a "Performance 2018 – YTD 2019" summary that claimed a closing balance as of March 19, 2019 of $13,041,761.  (Exhibit 6: summary of Highlake's account balance as of March, 2019, prepared by K. Poetschke).  In reality, the Highlake account balance was far lower than this figure.  Specifically, as of December 31, 2019, the Highlake account had $5,235,973 in net assets with an outstanding margin loan balance of $9,040,526. (Exhibit 7: December 31, 2019 Highlake Investment Report prepared by Credit Suisse).

48.     Oddly, the Defendants' March 2019 "summary" expressed the value of the Highlake account in "absolute" assets as opposed to true Highlake assets net of loan proceeds that

would need to be repaid.  Poetschke later explained in an apologetic email to Esteban, dated March 19, 2020 and sent from his ICM email address, that these "absolute" figures reflected the gross amount of assets held in the account, inclusive of loan proceeds, without specifically identifying the loan proceeds as such and without otherwise accounting for the fact that the loan proceeds would need to be repaid.  In that same email, Poetschke promised that he would stop expressing Highlake's performance in "absolute" figures because he recognized that those figures "create distortions in performance."  (Exhibit 8: March 19, 2020 Email from K. Poetschke to E. Pineda).

49.     At no point during this March 22, 2019, meeting with Esteban in Miami did Poetschke disclose the massive losses that the Highlake account had already suffered and was continuing to suffer, or the loan proceeds that needed to be repaid.  Instead, he provided Esteban with false, inflated figures to conceal his already (and continuing) intentional mismanagement of the account.

50.     Even as recently as April 2020, after Esteban had first learned of the Defendants' misconduct, Poetschke continued to misrepresent the value of the Highlake account.  Indeed, on April 9, 2020, Poetschke provided another "summary" of the account's performance – from January 1, 2017 onward – which claimed the following gain/loss figures:

| Year | Annual Loss/Gain | Annual Percentage Change |
|------|------------------|--------------------------|
| 2017 | $ 735,668 | 3.25% |
| 2018 | $ (4,636,597) | -22.16% |
| 2019 | $ 1,433,051 | 10.21% |
| 2020 | $ (3,886,672) | -26.99% |

51.     In total, Poetschke reported that the Highlake account had lost $6,354,550 of its value between January 1, 2017 and April 9, 2020.  This was a lie.

52.     In reality, Highlake's value had diminished to a much greater extent than stated by Poetschke, and it had lost value each and every year since 2017.

53.     Moreover, Highlake relied on the balance being provided by Poetschke for purposes of making distributions to Highlake's sibling shareholders.  To this point, Highlake relied on Poetschke's representations in determining when to make distributions and in what amount, and those decisions would have been different had Highlake been provided accurate information.

54.     In total, the Defendants' fraud and mismanagement is believed to have cost Highlake over $8.5 million since 2017—including an incredible diminishment in asset value of **over 73%**.  This all happened despite the fact that, as Poetschke himself conceded in a WhatsApp chat with Esteban on March 16, 2020, until the COVID-19 crisis, the stock market was in the midst of the longest bull run in history.

55.     To add insult to injury, while the Highlake account shriveled, the Defendants' wallets ballooned—by their own math, they made $780,170 in management fees for the same time period.[4]  (Exhibit 10: summary of Highlake's performance between January 1, 2017 and April 9, 2020, prepared by K. Poetschke).   Moreover, the account had expended an additional $945,922 in loan interest due to Poetschke's unilateral employment of margin trading, despite the fact that Esteban had never known of, let alone supported, such a strategy.  Simply put, Kai had never disclosed such a strategy, and it had proven remarkably unsuccessful.  (*Id.*)

**B.     *Omissions and Withholding of Information***

---

[4] On information and belief, and over roughly the last decade, the Defendants have registered a fleet of vehicles in the State of Florida under either Poetschke's or ICM's name, including luxury vehicles such as Ferrari, Porsche, Maserati, Mercedes-Benz, BMW, Audi, and Land Rover.

56.     The Defendants were obligated to provide Highlake with consistent, fulsome, and transparent updates and disclosures with respect to the performance of the Highlake account.  For years, they failed to do so.

57.     Instead of providing the frequent and forthright disclosures required by the advisor-client relationship, Poetschke rarely met with Esteban and, even when he did, failed to provide the forthright disclosures required of an investment advisor.

58.     Initially at these meetings in Miami, and before 2016, Poetschke would bring with him a Credit Suisse statement and review the *real* figures with Esteban.

59.     This practice changed, though, after a few years.  During the conversations between Esteban and Poetschke from in and around 2016-onward, Poetschke provided only superficial status information to Esteban, generally in the form of "summaries" he created, as opposed to legitimate financial statements issued by Credit Suisse.  Other times, Poetschke arrived in Miami for these meetings with no documentation at all, offering excuses as to the oversight and promises to get the information to Esteban as soon as he could.  On various occasions throughout the years, Poetschke claimed that Credit Suisse had electronic issues such that he could not compile the Highlake account statements.  Under all scenarios, though, Poetschke amazingly never informed Esteban that the Highlake account was losing its value at a rapid rate.

60.     Poetschke only provided these summaries and superficial information about the account even though, on multiple occasions, Esteban requested full copies of the Credit Suisse statements.

61.     For example, on June 13, 2018, Esteban emailed Poetschke and asked for the Credit Suisse statement associated with Highlake as of December 31, 2017.  Rather than sending the documentation requested and allowing the losses in the account to be discovered, Poetschke

responded with a lie from his ICM email address on June 14, 2018, stating "[t]he value of the [Highlake account] as of December 31, 2017 is $15,765,338." (Exhibit 11: June 13-14, 2018 Email chain between K. Poetschke and E. Pineda). Not only did Poetschke withhold information directly requested by his client, he also misrepresented the then value of the account – as of December 31, 2017, the actual value of the account was $13,586,557.

62.     Further, Poetschke would proceed at times to tell Esteban that he "forgot" the statement at home but would send a copy over email later – a promise he would not fulfill.

63.     At the meetings in Miami between Esteban and Poetschke, Poetschke provided assurances that the investments were performing well. These statements were not true and the Highlake account value was, in actuality, bleeding by the day, but because of the Pineda family's history with Poetschke, Esteban had no reason to suspect anything untoward and fully relied on his fiduciary's statements.

64.     All along, the Defendants acted as the gatekeeper of the Credit Suisse statements. Early on in the advisor-client relationship, the Defendants arranged to have all Credit Suisse statements sent directly to them, as opposed to Esteban. As a result, the Defendants received all correspondence and statements from Credit Suisse for the Highlake account. The Defendants took advantage of this role by hiding losses, undertaking undisclosed margin loans to inflate management fees, and otherwise mismanaging the Highlake account without Esteban knowing.

65.     Esteban authorized the Defendants to receive the Credit Suisse statements on Poetschke's advice. (Exhibit 12: September 21, 2010 Email from K. Poetschke to E. Pineda; Exhibit 13: October 20, 2010 Email from K. Poetschke to E. Pineda). However, on multiple occasions, Esteban requested that Poetschke himself grant Esteban online access to the Credit Suisse statements and other account information. In response, Poetschke intentionally ignored

those requests or, instead, feigned an intent to facilitate the request.   Again, though, for years, Poetschke inexplicably did not arrange for online access for Esteban.[5]

66.     By restricting Esteban's access to Credit Suisse statements, the Defendants became the *de facto* custodians of the Highlake account and the securities therein.  The Defendants had no reason to believe that Credit Suisse was delivering account statements to Esteban, and in fact not only had knowledge that Credit Suisse was not sending statements to Esteban, but also that Esteban did not have online access to the statements.

67.     Because the Defendants had directed Credit Suisse not to send statements directly to Esteban, the Defendants were themselves obligated to send account statements.  They did not do so, despite Esteban's repeated requests.

68.     The Defendants intentionally withheld numerous material account positions, as well as other relevant and material account documents they received directly from Credit Suisse. They did so to conceal the unsuitable and undisclosed trading in which they were engaged and to keep Highlake ignorant to the losses the Defendants created.

69.     After the Defendants' misconduct came to light, ICM, through Poetschke, admitted that the Defendants had failed to inform Esteban of Highlake's high-risk, undisclosed trading activity and further admitted that these investments were inconsistent with Esteban's expressed investment objectives.  Specifically, Poetschke sent Esteban an email from his ICM email address on March 17, 2020, stating:

> I will begin to send you a monthly report with commentary going forward so that you have full transparency. I will also run all of ideas (*sic*) by you for your approval. When I said that I was heavily invested in airline stocks I could hear you cringe through the phone that one "never buys airline stocks because they go bankrupt". And now, unless the government comes in soon, most airlines in the US and around the world will disappear. In the future I want to be sure to have your feedback on

---

[5] Only recently (in about August 2020) has Esteban been able to receive online access to Highlake's Credit Suisse accounts.

the general allocation. A regular Whatsapp call will help. **I am so sorry and it is my responsibility that I neglected to involve you and now put us here.**

(Exhibit 14: March 17, 2020 Email from K. Poetschke to E. Pineda) (emphasis added).

70.     Poetschke knew that Highlake, through Esteban, trusted him in managing the assets in the account, and also that the trading in which the Defendants were engaged neither meshed with the investment strategy that Highlake expected nor was disclosed.

71.     Importantly, the "summaries" that Poetschke provided to Esteban omitted discussion of the margin loans he had taken out on behalf of the Highlake account, as well as detailed transaction activity. *None* of these summaries before April 2020 even hinted at loan activity within the account, and Poetschke never orally informed Esteban of the loan activity.

72.     For example, account summary documents created and provided by Poetschke to Esteban, dated February 2017, December 2017, December 2018, and March 2019, all failed to reflect loan activity, despite the fact that the account was materially indebted during all three years. (Exhibit 5; Exhibit 21: December 22, 2017 summary of Highlake's performance prepared by K. Poetschke; Exhibit 15: 2018 summary of Highlake's performance prepared by K. Poetschke; Exhibit 6).

73.     As a specific example, Esteban met with Poetshke in Miami the morning of December 26, 2017.  At that meeting, Poetschke provided Esteban with a "summary" document claiming an account balance of $16,094,854.  (Exhibit 21).  Nowhere in this summary did Poetschke disclose the fact that, in reality, millions of dollars in loans encumbered the account.  In fact, Poetschke did not disclose the existence of the loan activity at all.

74.     Moreover, as Poetschke recognized in a March 19, 2020 email to Esteban, sent from Poetschke's ICM email address, these "summaries" provided Esteban with the "absolute" values associated with the Highlake account, meaning inclusive of loan proceeds, *without* disclosing to

Esteban the existence of those loans, which the Defendants all-but-admitted as fraudulent by acknowledging later that they "create distortions in performance."  (Exhibit 8).

75.     At no point did the Defendants encourage Esteban to compare information provided in the Defendants' summaries with Credit Suisse statements.  In fact, the Defendants made sure that Esteban would not receive Credit Suisse statements so as to conceal their fraudulent omissions and mismanagement.

### C.     *Failure to Disclose High-Risk Investment Strategy*

76.     The Defendants failed to disclose to Highlake that they were employing a high-risk investment strategy—a strategy of which Highlake never knew until it was too late, and a strategy that was contrary to Esteban and Esteban Sr.'s consistent expectations.  Indeed, until very recently, Esteban believed, based on express conversations with Poetschke, that the Defendants would only buy and sell stocks, equities, bonds, and other "traditional" asset classes and would only manage the portfolio on that basis.

77.     But since at least in and around 2016, the Defendants used margin to purchase large positions in structured, illiquid and highly risky financial derivatives and products without disclosing the same to Highlake.

78.     This type of strategy introduces a level of risk that is inconsistent with the expectations of Esteban (and his father before him) on Highlake's behalf: it combines the risks ordinarily associated with employing leverage with the significant and inherent risks of sophisticated and complex financial instruments and products.  This type of strategy exposes an investor to significantly more risk and potential loss than traditional investing and was a strategy that Esteban did not direct.

79.     The Defendants neither disclosed to Esteban their intent to trade on margin, nor the subsequent fallout from that failed plan.  Indeed, Poetschke never raised the prospect of trading on

margin with Esteban at any of their in–person meetings in Miami, despite ample opportunity to do so.  This was an intentional decision by Poetschke and further served to conceal the Defendants' manipulative conduct within the Highlake account.

80.     Poetschke, on Highlake's behalf, maintained debts of approximately $8 million in 2016, $10 million in 2017, $10 million in 2018, and $9 million in 2019. He amazingly *never* informed Esteban of this borrowing.

81.     As a specific example, and as noted above, Esteban met with Poetshke in Miami the morning of December 26, 2017.  At that meeting, Poetschke provided Esteban with a "summary" document claiming an account balance of $16,094,854.  (Exhibit 21).  Nowhere in this summary did Poetschke disclose the fact that, in reality, millions of dollars in margin loans encumbered the account.  In fact, Poetschke did not disclose the existence of the debt at all.

82.     The Defendants' irresponsible use of leverage in Highlake's account is evidenced by the fact that at times during the past five years, margin loans exceeded 60% of the gross asset value of Highlake's Credit Suisse portfolio.

83.     The Defendants failed to apply the heightened scrutiny necessary to assess whether such risk-laden investments fell within Highlake's objectives and expectations.  Had they done so, they would have immediately seen that the risk did not comport with Highlake's goals.

84.     Moreover, since 2016, without discussion with Esteban and Highlake, the Defendants used significant amounts of Highlake's portfolio value and loan proceeds to purchase reverse convertible bonds.  Specifically, in 2017 and 2018, reverse convertible bonds constituted *nearly all* of the value in the Highlake portfolio.

85.     Reverse convertible bonds are "bonds" that can be converted to cash, debt, or equity at the discretion of the issuer of the bonds.  They have complicated features that protect

sophisticated bond issuers at the expense of lesser-informed investors, and once were called "nest-egg slashers" by the Wall Street Journal.[6]

86.    Investors should not buy reverse convertible bonds unless they are comfortable owning the underlying assets.  Despite the level of risk associated with this category of investment, the Defendants never discussed the risks and benefits associated with Highlake holding significant proportions of its portfolio in these derivative instruments or disclosed to Highlake this risky strategy.

87.    Reverse convertible bonds are high-risk derivative instruments and their employment within the Highlake account was inconsistent with Highlake's previously-expressed goals and investment expectations.  This financial instrument carries so much risk and is so sophisticated that FINRA released a regulatory notice reminding investment advisors of their obligation to ensure that their clients understand the risks, terms, and costs associated with this investment.[7]

88.    Reverse convertible bonds are also notably – and unsurprisingly in this instance - associated with high commissions and fees.  Based on information and belief, the commissions and fees associated with the Defendants' purchase of reverse convertible bonds are estimated to have been between 0.7 percent and 1.5 percent of the face value of each reverse convertible bond, if not more.

89.    During all relevant times, the Defendants never reported any of these purchases, sales, or related losses and fees to Highlake until the market crashed in early 2020 and Poetschke's conduct was literally forced to come to light.

---

[6] *See* https://www.wsj.com/articles/SB124511060085417057.
[7] *See* https://www.finra.org/rules-guidance/notices/10-09.

90.     The Defendants engaged in this risky trading activity to increase the fees and commissions they earned in connection with managing the Highlake account.  By withholding account statements and position information as explained above, the Defendants were able to conceal numerous transactions, mostly in reverse convertible bonds, from Esteban and Highlake.

**D.     *Undisclosed Investment Advisor Conduct***

91.     In addition to misrepresenting the value of Highlake's account and taking out significant margin loans on Highlake's behalf, the Defendants made investments on behalf of Highlake that caused undisclosed overdrafts in Highlake's cash balances.

92.     For example, in April 2017, the Defendants' purchase of securities in Highlake's account caused Highlake's cash balance to be overdrawn by approximately $1,033,875.  Weeks later, to cover the overdraft, the Defendants caused Highlake to take out a loan of $1,500,000. (Exhibit 16: Highlake account statement from January 1, 2017 through March 31, 2020).

93.     Not only were the margin loans not disclosed to Esteban, the Defendants caused loss to Highlake in the form of interest by not immediately deploying the undisclosed borrowed funds.  For instance, while margin loans were outstanding between 2016 and early 2017, rather than investing the proceeds in February 2017, such proceeds were not invested in securities until April 2017.  (Exhibit 16).

94.     Moreover, the Defendants did not advise Esteban that his request to make certain distributions to his siblings would cause Highlake's cash balance to be overdrawn.  For instance, in August 2017, a $500,000 withdrawal caused Highlake's cash balance to be overdrawn by $317,619.40, only to be covered by a new margin loan taken out by the Defendants nearly one month later.  (Exhibit 16).

95.     The Defendants did not responsibly manage and monitor Highlake's account as would be expected of a professional investment advisor.  For example, and consistent with the

purpose of Highlake, Esteban requested a $2,000,000 withdrawal from Highlake's account to distribute to certain of his siblings.  (Exhibit 17: January 19, 2017 Email from E. Pineda to K. Poetschke).  In response, Poetschke responded that "I will generate the required liquidity now (is not a problem)…"  *Id.*  Had Poetschke reviewed the balance of Highlake's account at that time, he would have seen that there was approximately $5,200,000 in liquidity, and by the time the distribution was actually made, there was approximately $14,500,000 of liquidity in the account. Hence, there was no need to "generate" the required liquidity.

### E.    *Fraudulent Inflation of Assets under Management and Commissions*

96.    The Defendants' management fees are based, in part, on the assets under management within the Highlake account.[8]  The greater the assets under management, the greater the management fees to which the Defendants are entitled.

97.    The assets under management fee is calculated via the account's gross assets— meaning the assets under management calculation here included the undisclosed loan proceeds.

98.    Since at least 2016, without informing Highlake, the Defendants inflated the fees to which they were "entitled" by pumping the Highlake account with loan proceeds.

99.    For years, Esteban was unaware that ICM—through Poetschke—was taking out loans and trading on margin within the Highlake account.  When Esteban learned of this activity, he was utterly shocked.  One, this was inconsistent with the investment objective of Highlake. Two, the Defendants simply had never disclosed this approach to Highlake.

100.    Poetschke never told Esteban he was taking out loans or trading on margin, despite his absolute obligation to do so, and he withheld this information so he could continue to raise his management fees without being questioned by Esteban.

---

[8] *See* https://reports.adviserinfo.sec.gov/reports/ADV/147508/PDF/147508.pdf (ICM Form ADV).

**IV.**     ***Highlake's Portfolio Bleeds Funds with No Notifications from the Defendants***

101.     The conduct described above directly and proximately caused Highlake massive losses.  Highlake's assets suffered greatly from the Defendants' ongoing fraud and concealment.

102.     From at least 2016-onward, the Defendants' intentional mismanagement of Highlake's account resulted in massive losses in portfolio value.  By the end of 2017, the substantial undisclosed and unsuitable positions in which the Defendants traded Highlake's assets were exposed to their inherent downside risk, and the valuation of the investments suffered drastic, consistent losses.

103.     Specifically, from December 31, 2016 through April 9, 2020, the Defendants mismanaged Highlake's account to such an extent that it lost over an estimated 73% of its value.

104.     ***Importantly, this loss in value did not happen all at once.  Nor was the loss the result of one errant event, one bad decision, or one tough year***.  Instead, *for years*, during a long bull market, the Defendants consistently made poor decisions, hid losses from Esteban, lied to Esteban about the status of the account, and continued to implement an undisclosed risky strategy to enrich themselves as their client unknowingly bled.

105.     In total, the Defendants' mismanagement is believed to have cost Highlake over $7 million in losses since 2017, a figure that does not even factor in the enormous management fees claimed by the Defendants (in excess of $750,000) and the stunning amount of interest paid (in excess of $900,000) on the undisclosed loans that the Defendants took out through Highlake during that same time.

**V.**     ***The Defendants' Conduct is Exposed as the Market Crashes and Poetschke Admits Mismanagement While Simultaneously Blaming COVID-19 for All Issues***

106.     In early 2020, the markets crashed in wake of the COVID-19 pandemic.  At this point, given the massive losses in the Highlake account and the fact that funds were running so

low that the Defendants were at risk of losing the entire value of the account through margin calls, Poetschke had no alternative but to face Esteban, provide an update, and ask for more capital to avoid a margin call by Credit Suisse.  Despite having ample opportunities in the past to provide transparency in his disclosures to Highlake regarding its performance, Poetschke never did so, and only a market crash led to Highlake finally learning some (but not all) of the truth.

107.    On March 15, 2020, Poetschke sent Esteban an email from his ICM email address, asking Esteban to send $950,000 to defend a position such that "we will be OK." (Exhibit 18: March 15, 2020 Email from K. Poetschke to E. Pineda).  This was a lie.  Remarkably, despite making a request for nearly $1 million, Poetschke did not provide any meaningful update on the butchered performance of the account.

108.    Two days later, Poetschke was finally forced to disclose—after years of intentional mismanagement and lies—the existence of the loans and margin trading, and he admitted that he had not provided these details previously.  Remarkably, though, he still continued to misrepresent Highlake's historical performance.  Indeed, on March 17, 2020, Poetschke stated that the margin trading strategy "worked very well in 'normal' markets."  (Exhibit 9: WhatsApp Chat between K. Poetschke and E. Pineda).  This could not be farther from the truth, though, with respect to Highlake, which had lost value every year since 2017 despite trading on margin.

109.    That same day, with the sky falling down around him and Highlake, through Esteban, demanding detailed statements regarding the portfolio, Poetschke admitted that he failed to provide account statements in the past: "In the future, I will send you monthly updates by email so that when you see the need to review anything you can just connect right away."[9]  (Exhibit 9).

---

[9] There are multiple typos throughout these conversations.  We have corrected many of the typos in the allegations herein for legibility, but have not affected the substance of any communication.

110.     Even at this point, however, Poetschke still tried to provide only a summary.  But this time, Esteban would not allow it: "Need details on . . . every stock we have! . . . . Everything in paper via email.  **Not an overview.**" (Exhibit 9).  And only in response to this mandate did Poetschke finally provide only certain historical Credit Suisse statements to Esteban.

111.     With the Defendants' manipulation and fraud coming to light, Esteban pushed further, and yet Poetschke continued to fabricate answers.   In a chat between Esteban and Poetschke on March 18, 2020, Esteban noted that "[w]e had breakfast just in December and [you] failed to tell me how bad you were heading!"  Despite the fact that the Highlake account had been withering for years, Poetschke responded "[t]hey were not bad then.  This literally came out of nowhere. . . .  **This is no excuse because I was way too aggressive but had the corona virus not hit us, we would be fine.   But again, this is no excuse.   It is my fault and I take full responsibility.   I am devastated.**" (Exhibit 9) (emphasis added).

112.     But the omissions also continued.  On March 19, 2020, Esteban further stated to Poetschke "[y]ou forgot to tell me about the 6 million loan which was executed last week!"  In response, Poetschke did not object to this statement or deny it in any way. (Exhibit 9).

113.     Notably, Poetschke, knowing his intentional mismanagement had finally been discovered, made a number of striking admissions in this time period:

     a.  March 17, 2020: "I am in your debt and I am beyond sorry for having misjudged the market so badly." (Exhibit 14).

     b.  March 17, 2020: "I am so sorry and it is my responsibility that I neglected to involve you and now put us here." (Exhibit 14).

     c.  March 18, 2020: "Esteban, I am without words.  I failed you. . . .  I failed [Esteban Sr.] too." (Exhibit 9).

d.  March 19, 2020: "[L]ooking back it was a huge mistake by me to go into this crash with as much leverage." (Exhibit 9).

e.  March 23, 2020: "I am reaching out because I want to change the way I have worked with you.  I want to provide you with answers to any questions you have and give you all the details you need . . . Now I just want to hold on to the last piece so that not all is lost." (Exhibit 9).

114.  Even after the Defendants' intentional mismanagement had been exposed, Poetschke attempted to shirk responsibility and further mislead Highlake—through Esteban—by repeatedly telling Esteban that Highlake's extraordinary losses were caused primarily by the COVID-19 pandemic and the ensuing governmental response, not the high-risk, undisclosed positions the Defendants had taken on behalf of Highlake in conjunction with extraordinary amounts of leverage.  For instance, in a March 17, 2020 email from his ICM email address, Poetschke stated "I did not see the Corona Virus crash hitting us at all and I was invested in pretty much most of the wrong sectors."  He stated, "I pretty much assembled the poorest performing stocks in this Corona environment."  (Exhibit 14). Poetschke repeated similar sentiments in an April 10, 2020 email sent from his ICM email address ("I have no words for how I failed you during this corona crash.") (Exhibit 19: April 10, 2020 Email from K. Poetschke to E. Pineda), and a May 4, 2020 email (Exhibit 20: May 4, 2020 Email from K. Poetschke to E. Pineda).  Poetschke attempted to claim that Highlake's losses—which occurred for years before the COVID-19 pandemic—were caused by the pandemic and its aftermath rather than the Defendants' multi-year, high-risk, unsuitable and highly leveraged investment positions.  Specifically, ICM, through Poetschke, claimed that:

> "[Highlake's losses] *literally came out of nowhere*. The crash in the market started so violently. I did not see it coming.  This is no excuse because I was

> way too aggressive but had the corona virus not hit us, we would be fine.
> But again, this is no excuse.  It is my fault and I take full responsibility."

(Exhibit 9) (emphasis added).

115.    Poetschke failed to explain that by virtue of the high-risk, undisclosed investments the Defendants had selected, in any number of circumstances—unrelated to COVID-19—the Defendants could have caused Highlake to suffer enormous losses.  Indeed, as alleged in Section IV above, the Defendants' undisclosed trading activity led to significant losses every year for at least the three years immediately preceding the COVID-19 pandemic.

116.    In an ironic twist, Poetschke told Esteban in a March 17, 2020 email that, but for Esteban Sr.'s intervention, Poetschke would have mismanaged the previous 2008 financial crisis as well: "[W]e went into the financial crisis almost entirely in cash saving millions.  The reason was that your father convinced me to sell, something I did not want to do and I thought he was crazy to want to do." (Exhibit 14).  Despite this admission, Poetschke later tried to take credit for Highlake's success during the 2008 financial crisis, stating in an April 10, 2020 email to Esteban, "I just wonder how I could see the financial crisis in 2008, and do so much correctly, and to have failed you so badly now?" (Exhibit 19).

117.    And yet, even at this stage, Poetschke continued to lie to Esteban about the status of the Highlake account. On April 10, 2020, Poetschke sent an email from his ICM email address to Esteban containing a summary chart that provided the following gain/loss figures:

| Year | Annual Loss/Gain | Annual Percentage Change |
|------|------------------|--------------------------|
| **2017** | $ 735,668 | 3.25% |
| **2018** | $ (4,636,597) | -22.16% |
| **2019** | $ 1,433,051 | 10.21% |

| **2020** | $ (3,886,672) | -26.99% |
|---|---|---|

(Exhibit 19; Exhibit 10).

118.    In total, Poetschke reported that the Highlake account had lost $6,354,550 of its value between January 1, 2017 and April 9, 2020.  As so often had been the case in the past, this too was a lie.  Highlake's value had actually diminished to a greater extent than the amount that Poetschke provided.

119.    In total, Poetschke's intentional mismanagement had actually cost the Highlake fund over an estimated $7 million in account value losses alone since 2017.

120.    From at least 2016 to 2020, Poetschke, in an effort to conceal his misconduct, intentionally withheld from Esteban monthly Credit Suisse statements that would have detailed the true status of the Highlake account.  Only after the market crash when his intentional mismanagement came to light did Poetschke provide certain historical Credit Suisse statements, and not until December 2, 2020, well after the mismanagement came to light, did he finally begin to provide Esteban over email with current, monthly Credit Suisse statements detailing the true current status of the Highlake account.

## VI.    *The Defendants' Conduct is Irreconcilably Disparate from that of Highlake's Other Advisors*

121.    Highlake maintains relationships with other investment advisors for other investment portfolios and balances.

122.    In stark contrast to the Defendants' conduct described in detail above, Highlake's other investment advisors were transparent with Highlake and, as required, acted in its best interest.

123.    Highlake's other investment advisors never traded on margin, and any taking out of loans or use of lines of credit was always discussed with Esteban in advance.

124.    Highlake's other investment advisors never purchased reverse convertible bonds, equities in emerging markets, or other risk-laden financial products inconsistent with Highlake's expectations.

125.    Highlake's other investment advisors followed Highlake's guidance and performed consistently with Highlake's expectations, including by never purchasing equities in certain industries.

126.    Highlake's other investment advisors always provided access to the monthly statements associated with the accounts and regularly updated Highlake, through Esteban, of the accounts' actual performance.

127.    Highlake's other investment advisors had full and frank discussions with Highlake, through Esteban, before making any significant moves or strategic decisions.

128.    Highlake's other investment accounts *all increased in value from 2016 to 2019.*

## <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u> – VIOLATION OF 15 U.S.C. § 78j, RULE 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 10b-5 THEREUNDER

129.    Highlake realleges and incorporates by reference the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

130.    At all times relevant, the Defendants employed instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges to engage in manipulative and deceptive acts that operated as a fraud upon Highlake.

131.    As alleged herein, the Defendants, in connection with the purchase and sale of securities as described in this Complaint, knowingly, willfully, or recklessly: 1) employed devices, schemes, or artifices to defraud; 2) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and 3) engaged in acts, practices, and courses of business which would operate as a fraud upon Highlake and did operate as a fraud upon Highlake.

132.    The purpose and effect of the Defendants' unlawful course of conduct was, among other things, for the Defendants to enrich themselves at the expense of Highlake and to conceal the mismanagement of the Highlake fund and the losses caused to the same by the Defendants.

133.    The Defendants made numerous deceptive and untrue statements of material facts and omitted material information in establishing the investment strategy employed for the Highlake assets, managing the Highlake fund and inducing Highlake to place additional funds into the hands of the Defendants.

134.    Highlake reasonably relied to its detriment on the misrepresentations and omissions made by the Defendants in entrusting substantial assets with the Defendants to manage in the best interest of Highlake.

135.    The Defendants executed transactions within the national securities exchanges to the detriment of Highlake.  Highlake suffered losses through the Defendants' conduct.

136.    By reason of these omissions and misrepresentations, the Defendants violated 15 U.S.C. § 78j, Rule 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

137.    Highlake and its owners have been damaged as a result of the misdoings by the Defendants, in an amount to be proved at trial, but believed to be in excess of $8.5 million, exclusive of interests, fees, and other costs.

## COUNT II – BREACH OF FIDUCIARY DUTY

138.    Highlake realleges and incorporates by reference the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

139.     The Defendants were advisers to Highlake such that Highlake reposed trust and confidence in the Defendants, and the Defendants undertook such trust and duties.

140.     Specifically, Poetschke recognized and explicitly acknowledged that Highlake appointed him as its investment advisor, meaning he was responsible for the day-to-day management of its investments, and also for all issues regarding Highlake's account at Credit Suisse.  Poetschke further promised to manage Highlake's investments within the exact risk profile established through conversations with Esteban Sr. and later Esteban.   Poetschke explicitly expressed gratitude to Esteban Sr. and Esteban for their trust and confidence.

141.     The Defendants also shared a fiduciary relationship with Highlake based on the discretionary authority they exercised over the Highlake account, their superior knowledge concerning securities and investments, and because Highlake had reposed its trust and confidence in them.

142.     By virtue of their fiduciary relationship, the Defendants owed, among other things, the following duties and obligations to Highlake:

a.   To act in the best interest of Highlake and to deal with Highlake honestly, in good faith, and with the utmost degree of care;

b.   To avoid all conflicts of interest to the extent possible and to disclose the existence of any immovable conflicts;

c.   To act prudently and to recommend and maintain only prudent and suitable investments consistent with Highlake's investment objectives;

d.   To manage Highlake's account in a manner that comports with the needs and objectives of Highlake and its owners;

e.   To follow Highlake's and its owners' instructions in managing the accounts;

    f.   To keep Highlake's owners informed of any market changes that could affect their interests and act responsibly to protect those interests;

    g.   To keep Highlake's owners informed as to each transaction completed in Highlake's account; and

    h.   To explain fulsomely and forthrightly the practical impact and potential risks associated with the transactions and strategy employed for the Highlake account.

143.   The Defendants breached the duties owed to Highlake by, among other things:

    a.   Withholding pertinent information concerning the account;

    b.   Omitting negative impacts on the account;

    c.   Failing to disclose transactions in the account;

    d.   Engaging in a course of trading that was inconsistent with Highlake's investment objectives;

    e.   Employing an investment strategy that far exceeded Highlake's risk tolerance and failing to explain the risk associated with the strategy;

    f.   Not alerting Highlake's owners to the massive losses in the account or otherwise taking any action to prevent these losses, other than asking the owners for more money;

    g.   Concealing their improper and unsuitable trading activity by, among other things, withholding trade confirmations and account statements and instead providing single page "summaries" drafted by the Defendants; and

    h.   Trading in the Highlake account to enrich themselves at the expense of Highlake.

144.    Had the Defendants performed the required due diligence or exercised a reasonable level of care, they would have known that the investment strategy employed was unsuitable given Highlake's investment goals.

145.    As the employer of Poetschke and any other agent or employee of ICM that may have been involved in the mismanagement of Highlake's account, ICM is liable for the actions of its agents and employees.

146.    Highlake and its owners have been damaged as a result of the misdoings by the Defendants, in an amount to be proved at trial, but believed to be in excess of $8.5 million, exclusive of interests, fees, and other costs.

### COUNT III – FRAUD, FRAUDULENT INDUCEMENT, FRAUDULENT CONCEALMENT, AND MISREPRESENTATION

147.    Highlake realleges and incorporates by reference the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

148.    The actions of the Defendants alleged herein constituted a fraud upon Highlake and its owners and induced Highlake to provide more and more funds to the Defendants.

149.    To conceal their fraudulent conduct and the losses caused by such conduct, the Defendants intentionally misrepresented material facts and omitted material facts to Highlake and its owners regarding the conduct the Defendants were engaging in and the losses accruing in the Highlake account.

150.    The Defendants further made false representations of material fact concerning the condition of the Highlake account and the investments made therein, knowing such representations were false, with the intent to induce Highlake and its owners to rely on these false representations.

151.    Highlake and its owners relied on the Defendants' misrepresentations, omissions, and false representations to their detriment.

152.    As the employer of Poetschke and any other agent or employee that may have been involved in the mismanagement of the Highlake account, ICM is liable for the actions of its agents and employees.

153.    Highlake and its owners have been damaged as a result of the misdoings by the Defendants, in an amount to be proved at trial, but believed to be in excess of $8.5 million, exclusive of interests, fees, and other costs.

## <u>COUNT IV – NEGLIGENCE</u>

154.    Highlake realleges and incorporates by reference the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

155.    The Defendants owed a duty to Highlake and its owners to use reasonable care in developing an investment strategy for the account and managing the account.

156.    The Defendants breached this duty by, among other things:

   a.  Withholding pertinent information concerning the account;

   b.  Omitting negative impacts on the account;

   c.  Failing to disclose transactions in the account;

   d.  Engaging in a course of trading that was inconsistent with Highlake's investment objectives;

   e.  Employing an investment strategy that far exceeded Highlake's risk tolerance and failing to explain the risk associated with the strategy;

   f.  Not alerting Highlake's owners to the massive losses in the account or otherwise taking any action to prevent these losses, other than asking the owners for more money;

g.   Concealing their improper and unsuitable trading activity by, among other things, withholding trade confirmations and account statements and instead providing single page "summaries" drafted by the Defendants; and

h.   Trading in the Highlake account to enrich themselves at the expense of Highlake.

157.   These breaches of the duty to exercise reasonable care caused Highlake and its owners to suffer damages, including but not limited to, extreme loss in the value of the Highlake account's assets, plus all commissions and fees paid to the Defendants.

158.   Highlake and its owners have been damaged as a result of the misdoings by the Defendants, in an amount to be proved at trial, but believed to be in excess of $8.5 million, exclusive of interests, fees, and other costs.

**COUNT V – Investment Company Act § 36(b) Breach of Fiduciary Duty (Excessive Fees)**

159.   Highlake realleges and incorporates by reference the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

160.   The Defendants are the investment advisers to Highlake. Under Section 36(b), the Defendants owe a fiduciary duty to Highlake with respect to their receipt of investment advisory fees and other compensation from Highlake, including compensation labeled as administrative fees.

161.   The Defendants breached their fiduciary duties under Section 36(b) by charging investment advisory fees to Highlake, including those labeled as administrative fees, that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by the Defendants and could not have been the product of arm's-length bargaining.

162.   The fees charged by the Defendants for providing advisory services to Highlake represent a breach of the Defendants' fiduciary duties to Highlake because they are excessive and

were not negotiated at arm's-length in light of all the surrounding circumstances, including the Defendants' undisclosed use of loan proceeds to inflate the assets under management associated with the Highlake account.  Highlake specifically alleges that all excessive fees alleged herein have inured to the benefit of, and been received by, the Defendants.

163.    In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Highlake and the shareholders of Highlake ahead of their own interests, the Defendants have breached and continue to breach their statutory fiduciary duties to Highlake in violation of ICA § 36(b), both as a result of a flawed negotiating process and/or with respect to the substantive amounts of the fees.

164.    Pursuant to ICA § 36(b)(3) of the ICA, Highlake seeks the "actual damages resulting from the breach of fiduciary duty" by the Defendants, up to and including, "the amount of compensation or payments received from" Highlake or, pursuant to 15 U.S.C. § 80-46(b) ("§ 47(b) of the ICA"), rescission of the contracts, and investment returns that would have accrued to Highlake and/or Highlake shareholders had those fees remained in the portfolio and available for investment or distribution.

WHEREFORE, Highlake respectfully requests a judgment for all damages provided by law, including costs, interest, and attorneys' fees.

## JURY DEMAND

Highlake hereby demands trial by jury on all issues so triable.

Dated: December 8, 2020          Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

*/s/ Oliver Benton Curtis, III*
Oliver Benton Curtis, III
Fla. Bar No. 118156
*bcurtis@mwe.com*
Sean Hennessy
Timothy Farina
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
(305) 329-4442 (office)
(305) 347-6500 (facsimile)

*Counsel for Highlake Maritime Limited*